## APPEAL OF BOYNE CITY LUMBER CO.

Docket No. 4635.   Promulgated May 20, 1927.

1. The determination by a Commissioner of Internal Revenue of the March 1, 1913, value of timber for the purpose of determining the depletion allowance for any given year, does not preclude a Commissioner of Internal Revenue from determining a different value for the same timber to be used in the same way in the computation of the tax for another year.

2. The March 1, 1913, valuations of land and timber used by the Commissioner in the computation of tax herein involved, approved.

3. The petitioner consistently took its inventories on the basis of market. The Commissioner recomputed the closing inventory on the basis of cost or market, whichever is lower, without making the corresponding change in the opening inventory for the same year. *Held*, that such method distorted income and that the petitioner's method, since it more nearly reflects the true income, should be used.

*Oscar E. Waer, Esq.*, for the petitioner.
*Benjamin H. Saunders, Esq.*, for the Commissioner.

This is an appeal from the determination of a deficiency in income and profits taxes for 1918 in the amount of $552.10. The deficiency results from a reduction of alleged March 1, 1913, value of certain timberlands in arriving at the depletion deduction and in the adjustment of closing inventory.

### FINDINGS OF FACT.

The petitioner is a Michigan corporation with its principal office at Boyne City and is engaged in the manufacture of hardwood lumber. Its timber holdings during 1918 and prior years consisted of a tract hereinafter designated as Block 1, located in Charlevoix and Ostego Counties and a tract hereinafter designated as Block 2, located in Montmorency County.

Block 2 was previously owned by the W. H. White Co., which, due to some of its operations in the West, became pressed for funds and in order to procure the money needed contracted with the petitioner on February 1, 1910, as follows:

THIS AGREEMENT, Entered into in duplicate this first day of February, 1910, between W. H. White Company, a Michigan corporation, William H. White, Thomas White and James A. White, parties of the first part, and Boyne City Lumber Company, a Michigan corporation, of the second part.

WHEREAS, said party of the second part has purchased from W. H. White Company the lands and timber rights hereinafter referred to as "lands" and described in the schedule hereto annexed and made a part hereof and has paid for the price of Forty-two dollars ($42.00) per acre, the receipt whereof is acknowledged by said W. H. White Company; and

WHEREAS, part of said lands, namely; those described in Division 2 of said schedule, are subject together with other lands to a mortgage given by said

W. H. White Company to the Michigan Trust Company, February 1, 1908, to secure an issue of $800,000, of the bonds of said W. H. White Company, which mortgage said W. H. White Company has covenanted to pay and discharge; and

WHEREAS: the said parties of the first part, as a condition of said sale, have guaranteed to the party of the second part that the lands sold by them to the said party of the second part, to-wit: Seven thousand one hundred sixty (7160) acres in Montmorency County, Michigan, would cut a total of Eighty-four million (84,000,000) feet of log timber, measured log scale; and have further promised and agreed as one of the conditions of said sale that they would repurchase the said lands at any time before eight years from date at the price of Forty-two Dollars ($42.00) per acre with interest at six per cent (6%) per annum upon the purchase price thereof, together with any and all taxes then paid by said party of the second part, and interest which may have accrued thereon at six per cent (6%) per annum, subject, however, to destruction of the timber by fire, wind or the elements of nature accruing after this date and before said party of the second part shall request the said re-purchase of the said lands by the said parties of the first part; and

WHEREAS, the said parties of the first part have agreed to pledge with said party of the second part, two thousand shares (2,000) of the White Brothers Lumber Company stock of the par value of Two Hundred Thousand Dollars ($200,000.00) as collateral security to the guaranties, warranties and promises of said parties of the first part hereinafter contained:

Now THEREFORE, It is agreed by and between the respective parties hereto as follows:

1. Said parties of the first part shall and will indemnify and save harmless said party of the second part from all loss or damage which may at any time hereafter suffer directly or indirectly by reason of the non-payment and foreclosure of the aforesaid mortgage of February 1, 1908, which now constitutes a prior lien upon the lands described in Division 2 of the Schedule hereto annexed. A judgment or a decree for the non-payment of money obtained in any court of law or equity having jurisdiction and in favor of said party of the second part and against said parties of the first part, or either of them, based upon an adjudicated breach of the promise of indemnity contained in this paragraph shall be deemed a liquidation of damages for such breach entitling said party of the second part forthwith to enforce the security hereinafter provided.

2. Said parties of the first part expressly warrant, represent and promise that the present stumpage upon the said lands amounts to and will cut in the aggregate not less than eighty-four million (84,000,000) feet of timber, log scale, and hereby stipulate and agree that in the event that said lands do not produce the said Eighty-four million (84,000,000) feet of timber, log scale, either (a) to deliver to the said party of the second part enough virgin timber contiguous to said lands to make up any deficiency in the stumpage as above warranted, or (b) to pay the said party of the second part the sum of Three and 58/100 dollars ($3.58) per thousand feet for so much deficiency as may exist, with the interest thereon from this date to the time when such deficiency shall have been determined and paid at six per cent (6%) per annum.

It is stipulated that in determining said stumpage, Doyles Scale, so-called, shall be used. Said stumpage shall be determined by a disinterested scaler to be chosen by a majority of a board of three arbitrators, one to be chosen by said parties of the first part, one by the said party of the second part, and the third by the two other, and the findings of such scaler shall be final as between the parties hereto.

3. It is mutually agreed that the aforesaid conveyance of lands by W. H. White Company to said parties of the second part is intended by the parties to be a bona fide sale outright and no right defeasance has been reserved or shall be claimed by said W. H. White Company or any other of said parties of the first part; said sale is made at the instance of said parties of the first part and in consideration of the purchase of said lands by said party of the second part and as an express condition subsequent thereto, it is stipulated and agreed that any time on or before February 1, 1918, at the option of said party of the second part expressed by a notice in writing addressed to said parties of the first part and served upon them, or either of them but not otherwise, said parties of the first part will forthwith re-purchase or provide a purchaser for all of said lands, the timber on which shall not have been destroyed by fire, wind or other natural elements, and will pay therefor in cash or upon such terms as may be mutually agreed upon, the sum of forty-two dollars ($42.00) per acre with interest, thereon, at the rate of six per cent (6%) per annum from February 1, 1910, plus all taxes upon the lands re-purchased which shall have accrued and been paid by said party of the second part with interest thereon at the same rate. In the event that said party of the second part shall exercise the option to sell hereby granted, the service of the aforesaid notice together with a description of the lands to be sold and the tender of a deed by said party of the second part running to W. H. White Company covering said lands and warranting the title thereof against the acts of said party of the second part shall constitute a full performance by said party of the second part of all conditions precedent to its right to have said parties of the first part repurchase said lands as herein provided, provided however, that any right-of-way for railroad purposes which said party of the second part may hereafter grant to the Boyne City Gaylord and Alpena Railroad Company shall not constitute a breach of said warranty but are expressly consented to by said parties of the first part, and they agree to re-purchase said lands subject to any such rights-of-ways so granted. If, after a full performance by said party of the second part of all conditions precedent to the right secured to it by this paragraph, said parties of the first part shall remain in default in the performance of their promises contained in this paragraph for a period of six (6) months after a proper deed covering said lands shall have been tendered, then said party of the second part shall be entitled forthwith and without legal proceedings to enforce said security as hereinafter provided, and in such event the damages sustained by said party of the second part by reason of the failure of said parties of the first part to re-purchase as herein promised shall be liquidated and fixed at the amount which said party of the second part shall be entitled to receive for the lands sought to be reconveyed, less the amount said lands shall sell for at public sale, advertised as provided by statute for the sale of lands under a decree of foreclosure, after the expenses of such sale shall have been deducted.

In case of default as above specified said party of the second part may proceed to sell said lands in the manner and upon notice prescribed by statute, as aforesaid, and to apply the proceeds of sale thereof in reduction of the amount due to it from said parties of the first part by virtue of their agreement to re-purchase. Any surplus of such sale after deducting expenses of advertising and sale shall be paid to the said parties of the first part. In case of a deficiency after such sale, said party of the second part may proceed in the manner hereinafter provided against the stock pledged as collateral security hereto. It is expressly understood that the foregoing remedies are not mutually exclusive but are cumulative, and nothing herein shall be con-

strued to deprive said party of the second part of the right to pursue any other remedy or remedies available to it at law or in equity for a breach of said promise to re-purchase.

4. It is expressly understood that the election of said party of the second part to re-convey said lands shall not operate as a waiver of any breach of any other promise of said parties of the first part herein contained resulting in damage to said party of the second part.

5. If said party of the second part shall resort to the enforcement of the security herein provided on account of the breach of any promises contained in this contract such action shall not be construed as a rescission or as a repudiation by said party of the second part of this contract as a whole, but the same shall continue in force according to its terms.

6. As collateral security to the several warranties, agreements and promises of said parties of the first part herein contained and as security for the prompt performance of said agreement and promises said parties of the first part have assigned and pledged, and hereby assign and pledge, to and with said party of the second part of all their collective and several right, title, and interest in and to Two Hundred Thousand Dollars ($200,000) par value of the Capital Stock of White Brothers Lumber Company full payment thereon guaranteed and have delivered duly assigned certificates representing the same to said party of the second part.

7. Whenever said party of the second part shall be entitled by the terms hereof to resort to said security the same shall be enforced by, and said party of the second part is authorized to make, a sale of all or part thereof at the option of said party of the second part, at private or public sale, and at such sale said party of the second part may be the purchaser. In case of sale, public or private, such notice shall be given as is required by the statutes of the State of Michigan in such case made and provided and notice of sale served upon any one of said parties of the first part shall be deemed notice to all.

The proceeds of every such sale shall be applied in the following order:

*First:* To the payment of the indebtedness by way of damages, the payment of which is the object to such sale.

*Second:* To the creation of cash security for the performance of any subsisting obligation of said parties of the first part under the terms of this contract.

*Third:* When no further obligation longer subsists all balance of security in the form of cash or stock shall be returned to said parties of the first part.

The intention of the parties is not only that said party of the second part shall at all times have the right to resort to said security for a particular breach of this contract but also that so long as any obligations of this contract shall be entitled to retain in its hands all such portions of said security as shall remain unsold after any sale for a particular breach of this contract.

8. This contract shall be binding upon and shall inure to the benefit of the respective parties hereto, their heirs, executors, successors and assigns.

IN WITNESS WHEREOF, said W. H. White Company has caused this agreement to be executed on its behalf by its president and has caused its corporate seal to be hereto affixed, attested by its Secretary, and said Boyne City Lumber Company has likewise caused this agreement to be similarly executed on its behalf and the individual parties hereto have hereunto set their hands and seals the day and year first above written.

Two deeds making absolute conveyance in fee of 7,120 acres of the property referred to in the contract and the timber rights on the

remaining 40 acres had been made on the nineteenth of the preceding month.

At or about the same time the petitioner also entered into a contract with the Boyne City Gaylord & Alpena Railroad Co. whereby the latter agreed to extend its road through Block 2 and to haul logs from that tract to Boyne City for $3.50 per thousand feet, chemical wood at $1 per cord, shipping wood at $1.50 per cord, and bark, posts, ties, etc., at the general tariff rate prevailing at the time of shipment.

On December 8, 1911, the contract of February 1, 1910, between the petitioner and the W. H. White Co. was modified so that the former could not require the latter to repurchase Block 2 unless demand was made on or before August 1, 1917, and in consideration for this change the latter company agreed to pay interest on interest, in case of repurchase.

Early in 1913 both the W. H. White Co. and the Boyne City Gaylord & Alpena Railroad Co. were placed in the hands of a receiver, the Michigan Trust Co. being appointed receiver for both companies.

At some time prior to 1910 the timber on Block 2 was damaged by fire. In 1914 the attention of the board of directors of the Boyne City Lumber Co. was called to the fact that a great quantity of hemlock had died as a result of the fire and should be cut without delay to prevent loss from decay. At a meeting of the board on November 16, 1914, a committee appointed to investigate the situation made the following report:

Your Committee, to whom was referred for consideration and recommendation the question of the proper policy to be adopted by the Boyne City Lumber Company with respect to the timber lands in Montmorency County which it purchased from the W. H. White Company February 1, 1910, begs leave to report as follows:

It will be remembered that upon the date these lands were purchased the two companies mentioned entered into a written contract, the main features of which were as follows: *First*, the White Company indemnified our company against loss by reason of the foreclosure of the W. H. White Company mortgage of February 1, 1908, which constituted a first lien upon 4600 out of 7160 acres of the lands in question; *second*, the White Company guaranteed that the stumpage on the tract amounted to and would cut not less than 84,000,000 feet log scale; and *third*, the White Company agreed that any time prior to February 1, 1918, (which date was altered by a supplemental agreement to August 1, 1917) it would, at the option of our company, buy back or provide a purchaser for all of said lands, the timber on which shall not have been destroyed by fire, wind, or other natural element, at $42.00 per acre plus taxes and interest, as specified in the contract. As collateral security to the promises of the White Company made in this contract said company pledged, and our company now holds, $200,000 par value of the capital stock of the White Brothers Lumber Company.

The question considered by your Committee has been whether under all of the circumstances existing at the present time, it would be for the best

interest of the stockholders of the Boyne City Lumber Company to exercise the option of re-sale contained in said contract, or to retain the lands permanently, or finally, to defer action on the matter until a later time prior to the expiration of the option.

In considering this question the following facts and circumstances have seemed to your Committee to have a more or less vital bearing upon the problem, namely: *First:* That there is at the present time a large amount of dead timber, chiefly burned hemlock, upon the lands, estimated to amount in the aggregate to approximately 16,000,000 feet. *Second:* That it is desirable that this dead timber be salvaged at the earliest possible date. *Third:* That to permit logging operations it will be necessary to obtain railroad facilities by the extension of the lines of the Boyne City, Gaylord & Alpena Railroad Company; and *fourth*, that both the W. H. White Company and the Boyne City, Gaylord & Alpena Railroad Company are at present in the hands of a receiver.

Taking all of the circumstances into consideration your Committee feels that whichever course this company adopts with respect to these lands action should be taken promptly because of the unquestionable necessity of removing the dead timber before it shall have deteriorated any further, and we therefore strongly advise against allowing a determination of the company's policy to be deferred any longer. The necessity of action is further shown by the fact that as matters now stand our company can not enter and cutover these lands without waiving any right possessed under the contract to turn them back to the White Company.

Upon the main question, namely, whether we shall decide to keep the lands or turn them back, our judgment has necessarily been influenced somewhat by the present financial difficulties of the W. H. White Company. At the same time, while those difficulties would present serious doubts as to our being able to procure satisfactory terms of payment in case of a re-sale, we have not been governed so much by that factor in arriving at the recommendations which follow as we have been governed by what we believe to be the best interests of the Boyne City Lumber Company.

Your Committee unanimously recommends, *first*, that the company decide at this time to retain these lands provided that concurrently with our decision to retain them the following conditions can be satisfactorily met by effective arrangement with the various parties, namely; (1) That the W. H. White Company and its receiver waive the right to deduct now or hereafter from the stumpage warranted in the contract of February 1, 1910, any timber damaged or destroyed by fire or other natural elements either in the past or in the future; (2) That an effective arrangement be entered into between this company and the Boyne City Gaylord & Alpena Railroad Company and its receiver assuring this company of adequate railroad facilities for logging the tract when needed, and assuring a satisfactory freight rate on logs; (3) That a satisfactory arrangement be entered into between this company and The Michigan Trust Company, as Trustee under the W. H. White Company mortgage of February 1, 1908, whereby the dead timber now upon the tract can be salvaged in harmony not only with the provisions of said mortgage but also upon a basis which shall be equitable to the Boyne City Lumber Company; and (4) That the security afforded to this company by the contract of February 1, 1910, be preserved in full force until such time as the first mortgage of the W. H. White Company shall have been discharged and until the stumpage-warranty shall have been fully satisfied.

The second recommendation of your Committee, based upon the assumption that the foregoing features are satisfactorily smoothed out, is that the Boyne City Lumber Company proceed as soon as possible to salvage the dead timber

upon the tract by cutting and removing the same, and that it suspend operations elsewhere, if necessary, to enable it to cut out this dead timber; and that thereafter the further cutting of the live timber upon this tract be undertaken as the Board of Directors may deem expedient.

As a result of this report a further agreement was negotiated with the W. H. White Co. reading as follows:

THIS AGREEMENT, entered into this 18th day of February, 1915, between W. H. WHITE COMPANY, a Michigan corporation, WILLIAM H. WHITE, THOMAS WHITE and JAMES A. WHITE, parties of the first part, and BOYNE CITY LUMBER COMPANY, a Michigan corporation, party of the second part, WITNESSETH:

WHEREAS, the parties hereto on the first day of February, 1910, did enter into a certain contract in writing in reference to certain timber lands, to-wit: seven thousand one hundred sixty acres (7,160) acres, in townships 30 North, Range 3 East, and 30 North, Range 4 East, Montmorency County, Michigan, which were sold by said W. H. White Company to said party of the second part with contract, together with a supplement thereto, dated December 8, 1911, made provision among other things, for a re-conveyance of said lands at the sole option of said party of the second part, to be exercised on or before August 1, 1917, and further made provision whereby said parties of the first part guaranteed that the stumpage on said lands amounted to and would cut not less than eighty-four million (84,000,000) feet log scale; and whereas, at the date hereof, said option to re-sell has not been exercised or waived by said party of the second part; and

WHEREAS, there is at the present time a large amount of dead timber, chiefly burned hemlock, upon said lands, estimated to amount in the aggregate to approximately sixteen million (16,000,000) feet, and it is highly desirable that this dead timber be salvaged at the earliest possible date; and

WHEREAS, to permit the logging and salvaging of said dead timber it will be necessary to obtain railroad facilities by the extension of the line of the Boyne City, Gaylord & Alpena Railroad Company, which cannot be financed by said Railroad Company at the present time because it, as well as said W. H. White Company, at present is in the hands of the Michigan Trust Company as receiver, by virtue of an order of the District Court of the United States for the Western District of Michigan, and

WHEREAS, said parties of the first part desire that said party of the second part shall permanently retain the title to said lands and waive its said option to re-convey, but said party of the second part is unwilling to commit itself to that policy except on condition that the necessary extension to said Railroad be speedily constructed to promote which said party of the second part is making arrangements concurrently with the execution of this agreement with said receiver, whereby said party of the second part is also unwilling to commit itself to the retention of said lands except upon condition that said parties of the first part shall assent to certain modifications of said contract of February 1, 1910, and the supplement thereto, as hereinafter set forth.

Now THEREFORE, in consideration of the promises and of the mutual promises of the parties hereto, it is agreed by and between them as follows:

1. Subject to each and every condition herein contained and to the performance of each and every promise of said parties of the first part herein made, said party of the second part agrees to waive its right to re-convey said lands as reserved unto it in said contract of February 1, 1910, and the supplement thereto, provided that however, such waiver shall not be effective for any purpose until such time as the receiver of the Boyne City Gaylord and Alpena Railroad Company shall have completed and placed in operation an extension of

the main line of said railroad from Atlanta to Dobbins' farm, so-called, in Montmorency County, a distance of, to-wit; five and eight-tenths (5.8) miles.

2. In consideration of said agreement to waive right to reconveyance, said parties of the first part jointly and severally promise to said party of the second part, that they will waive all right and claim of right to deduct now or hereafter from stumpage warranty in said contract of February 1, 1910, any timber damaged or destroyed by fire or other natural elements, either in the past or in the future, and they do jointly and severally agree to be bound by said warrant of eighty-four million (84,000,000) feet without deduction of, or allowance for, any timber so damaged or destroyed. Said parties of the first part further jointly and severally agree to be bound by said stumpage warrant irrespective of the time which may elapse prior to the determination of the actual stumpage upon said lands.

3. It is expressly understood and agreed that except as herein expressly modified, said contract of February 1, 1910, and the supplement thereto, shall remain in force and fully binding upon said parties of the first part, and it is agreed that in construing said contract and supplement full reference may be had to this instrument which shall control such construction.

This agreement shall take effect only upon the happening of the following express concurrent conditions, namely, (1) that an effective arrangement be entered into between said party of the second part and the Boyne City, Gaylord & Alpena Railroad Company and its receiver, assuring said party of the second part of adequate railroad facilities for logging said tract of timber when needed and assuring a satisfactory freight rate on logs; and (2) that a satisfactory arrangement be entered into between said party of the second part and the MICHIGAN TRUST COMPANY, as trustee under the W. H. WHITE COMPANY mortgage of February 1, 1908, whereby the dead timber now upon said tract can be salvaged in harmony, not only with the provisions of said mortgage, but also upon a basis which shall be equitable to said party of the second part.

4. In the event that any of said conditions shall fail to be duly brought about, this contract shall be null and void, and if after it shall have taken effect, said parties of the first part shall at any time in the future commit a breach of any of their promises herein contained, then and in that event, said party of the second part shall forthwith become entitled to demand the repurchase of said timber lands or such portion thereof as shall remain uncut, in the manner and at the price per acre provided in said contract of February 1 and supplement thereto, whether before or after August 1, 1917.

5. It is not intended hereby to prejudice the rights of any creditors of said W. H. White Company, whose claims shall be entitled to allowance by the receiver of said Company, and said receiver has accordingly not been joined as a party hereto, but it is understood that said receiver approved of the provisions of this contract, which if put into effect, will relieve the estate in its hands of a claim of, to-wit; Four Hundred Fifty Thousand Dollars ($450,000.00) on the part of said party of the second part and it is expressly agreed that this contract shall be binding upon the successors and assigns of said W. H. White Company, notwithstanding the receivership, and shall be binding upon the heirs and personal representatives of the individuals who are parties of the first part.

IN WITNESS WHEREOF, said W. H. White Company has caused this agreement to be executed in its behalf by its President, and has caused its corporate seal to be hereto affixed, attested by its Secretary, and said Boyne City Lumber Company has likewise caused this agreement to be similarly executed in its behalf, and the individual parties have hereunto set their hands and seals the day and year first above written.

The petitioner also entered into a second contract with the Boyne City, Gaylord & Alpena Railroad Co. whereby the money necessary to extend the railroad into Block 2 was advanced. Lumber operations in Block 2 were then commenced.

Prior to 1915 the operations of the petitioner had been limited to Block 1, which had been acquired on organization of the corporation. On March 1, 1913, Block 1 contained 7,080 acres of timberland, which the petitioner owned in fee, and 945 acres to which the petitioner had the right of entry to remove the timber.

On December 17, 1919, the petitioner transmitted to the Bureau of Internal Revenue a filled-in form of the General Forest Industries questionnaire, to show the basis for the March 1, 1913, value claimed for its timber holdings. The estimated quantity of timber on Block 1 was 86,000,000 feet, log scale, Doyle rule, and the value placed thereon was $10 per thousand feet. In the case of Block 2 the quantity of timber was estimated to be 84,000,000 feet, the amount guaranteed by the W. H. White Co., and the value given was $9 per thousand feet. On September 3, 1920, the petitioner was advised by letter that the information submitted indicated that the March 1, 1913, value claimed for Block 1 was approximately 20 per cent too high and that claim for Block 2 was 10 per cent to 15 per cent too high.

Under date of November 13, 1920, the petitioner submitted a further statement in support of the values claimed, wherein it was stated that Block 2 " lay on better ground and was more accessible to transportation than the Ward estate property which was sold in 1914 under court order #5297, and which sold for $9 per thousand feet. This was generally regarded as being sold at less than its fair value at the time. Therefore, we believe the value of $9 placed on this block of timber is too low."

On or about August 31, 1923, a certificate of overassessment was issued by the Commissioner, showing total tax overassessed against the peitioner for 1917 in the amount of $1,074.50. On October 25, 1923, the petitioner mailed a letter to the Commissioner of Internal Revenue reading as follows:

COMMISSIONER OF INTERNAL REVENUE,
        *Timber Section, Washington, D. C.*

DEAR SIR: We wish you would kindly advise if you have yet determined the valuation on timber stumpage under our questionnaire, both for Block 2 and Block 1.

We have never been advised of any valuation that you have put on that timber, and if you have determined what it should be, we would be glad to know so that we can give it consideration.

        Yours truly,

                                BOYNE CITY LUMBER COMPANY,
                                W. L. MARTIN, *Secretary.*

Under date of November 6, 1923, the following reply was mailed to the petitioner from the office of the Deputy Commissioner of Internal Revenue:

BOYNE CITY LUMBER COMPANY,
                *Boyne City, Michigan.*

SIRS: Reference is made to your letter dated October 25, 1923, requesting information as to the valuation allowed for timber stumpage in your Blocks 1 and 2.

You are advised that on the basis of the quantities reported and evidence submitted, the fair market value of your property on March 1, 1913, has been appraised as follows:

| | | |
|---|---|---|
| Block I | | $812,000 |
| Land | $38,500 | |
| Timber | $774,000 | |
| Block II | | 727,200 |
| Land | $35,200 | |
| Timber | $692,000 | |

Respectfully,

J. G. BRIGHT,
*Deputy Commissioner,*
By E. D. TANNER,
*Chief of Section.*

Subsequently, on November 21, 1923, the Timber Section made a valuation report designated as " Revision of report dated November 27, 1920." In that report the following language appeared:

This case has been referred to this section for consideration of the RAR and supplementary data filed by the taxpayer.

An examination of this information discloses that the basis for valuation furnished by the taxpayer in its original questionnaire is erroneous in several important particulars. In view of these circumstances it appears that a revision of valuation report dated 11–27–20 is warranted. * * *

Since it is impossible to reconcile the timbered area and the quantity of timber as reported in its questionnaire with subsequent data, the quantity claimed is accepted tentatively in order to close the case through 1918.

The fair market value for land and timber in Block I as revised and recommended is as follows:

| | |
|---|---|
| Land 15,408 acres at $2.50 | $38,500 |
| Timber 86,000 M ft. at $6.57 | 567,020 |
| Quantity and total value tentative. | |

### Block II

* * * The fair market value for land and timber is accordingly restated as follows:

| | |
|---|---|
| Land 7,040 acres at $5.00 | $35,200 |
| Timber 84,000 M ft. at $5.37 | 451,080 |
| Quantity and total value tentative. | |

Under date of April 15, 1924, the petitioner was advised that an audit of its income-tax return for 1918 disclosed an additional tax liability of $19,976.88. A claim for the abatement of this amount

was immediately filed with the collector of internal revenue and a request was made for a hearing before the Commissioner. On May 12, 1925, the petitioner was advised that the claim had been allowed for $19,424.78, thereby leaving a deficiency of $552.10. In computing the deficiency the Commissioner has placed the value of the timber in Block 1 as of March 1, 1913, at $634,620, and in Block 2 at $324,094.60. In arriving at these values he used the actual quantity of lumber cut from these tracts from March 1, 1913, until they were cut out in 1923. The values per one thousand feet were the same as those appearing in the valuation report of November 21, 1923. The cut from Block 1 was 96,593,607 feet, log scale, and the cut from Block 2 was 60,352,811 feet, log scale.

On October 29, 1925, subsequent to the filing of this appeal, still another valuation report was made by the Timber Section of the Bureau of Internal Revenue basing depletion on Block 2 on cost alleged to have been $290,885.10, and also stating that the value as of March 1, 1913, did not exceed such cost.

The cut by species and the by products taken from Blocks 1 and 2 were as follows:

*Species of timber cut from timber owned March 1, 1913*

|  | Block 1 | Percentage | Block 2 | Percentage |
|---|---|---|---|---|
|  | *M feet* |  | *M feet* |  |
| Maple | 60, 629 | 62. 77 | 22, 695 | 37. 60 |
| Basswood | 5, 169 | 5. 35 | 2, 540 | 4. 21 |
| Beech | 3, 466 | 3. 59 | 12, 279 | 20. 34 |
| Birch | 745 | . 77 | 217 | . 36 |
| Ash | 56 | . 06 | 245 | . 40 |
| Elm | 19, 024 | 19. 69 | 688 | 1. 14 |
| Oak | 14 | . 02 | 216 | . 36 |
| Pine | 540 | . 56 | 3, 368 | 5. 59 |
| Hemlock | 8, 948 | 7. 19 | 17, 804 | 29. 50 |
| Miscellaneous | 3 | . 00 | 301 | . 50 |
|  | 96, 594 | 100. 00 | 60, 353 | 100. 00 |

*By-products taken from Blocks 1 and 2*

|  | Block 1 | Block 2 |
|---|---|---|
| (a)  Chemical wood stumpage | $16, 321. 05 | $15, 996. 32 |
| (b)  Chemical wood refuse, slabs, and edgings | 196, 829. 54 | 126, 206. 47 |
| (c)  Hemlock bark | 5, 092. 87 | 13, 059. 51 |
| (d)  Cedar | 3, 101. 92 | 61, 544. 14 |
|  | 221, 346. 38 | 216, 806. 44 |

For a period of a year or two immediately preceding and following March 1, 1913, the only hardwood timberlands offered for sale which were located within a reasonable distance of and were comparable to Blocks 1 and 2 were the holdings of the David Ward Estate. These holdings included practically all of the hardwood timberland in the

lower peninsula of Michigan which did not at that time already belong to some operator. The Ward interests had previously limited their operations to pine timber. The property in question had been left in trust under the will of David Ward, which trust expired on May 29, 1912, by its own limitation.

Among the last sales made by the trustees immediately preceding the expiration of the trust was that of the timber on tracts hereinafter designated as Parcels X, Y and Z. The timber on Parcel Z, which adjoined Block 1 on the south and contained approximately 1,260 acres, sold for $100,000. It was resold on August 14, 1912, for $138,000. The timber on Parcel X, which is located some 12 or 15 miles southwest of Block 1, and which contains 2,350 acres, was sold for $266,000. In case of Parcel Y, containing 280 acres, the timber sold for $33,250. These properties were of practically the same character as the taxpayer's Block 1, but were more accessible. Parcel Y was much more advantageously located for logging, and the run of timber was better. The actual cut on this parcel was 3,531,085 feet, log scale. It was not logged as closely as the Boyne City holdings. The stumps were higher and in the wind-blown area some 4 to 8 feet of each tree was left on the ground. This tract was logged in 1913 or 1914.

By order of court in a suit for partition the remaining blocks were sold at auction on August 4, 1914. Present at this auction were most of the large hardwood operators of this territory. The terms of the sale required a deposit of 10 per cent of the sale price. Parcel G, located north of Y mentioned above, and containing 960 acres, was sold first. It was purchased by Willis Ward for $95,000. This parcel was logged in 1920 to 1923, the cut being 13,434,670 feet, log scale. Other parcels were then sold in the order hereinafter named. Parcel F, located between X and Y, containing 1,060 acres, was sold to F. B. Ward for $95,000. This tract was logged, with the exception of approximately 250,000 feet, producing 15,175,000 feet, log scale, Scribner Rule. Neither F nor G was logged as closely as the Boyne City holdings. They were more conveniently located and other logging conditions were more favorable, and particularly so when compared with the northern part of Boyne City Block No. 1. The grade of timber on these tracks was also slightly better. Parcel E, adjoining F on the north, containing 1,080 acres, was sold to the same company for $36,000. Parcel D, adjoining E on the east, containing 1,000 acres, was sold to Willis Ward for $95,000. Parcel B, north and northeast of C, containing 1,477 acres, was bought by Willis Ward for $100,000. These latter tracts have not been completely logged and the actual cut can not be determined but the quantity of timber is practically the same and the tracts were laid out in such manner that the slope on each parcel is especially conducive to ex-

peditious and economic logging.   The Batchelor Lumber Co. pur-chased Parcel A, containing 320 acres, which parcel was located approximately 2 miles east of the other tracts, and nearer the Boyne City holdings, for $39,000.   This tract was superior to the other blocks, and was resold in 1918 for $85,000.   It was logged from 1919 to 1923, producing 5,015,857 feet, log scale.

In dividing the Ward holdings into the parcels as sold, care was taken to insure average timber for each parcel.   Special attention was also given in running the dividing lines so that the slope and proximity to a railroad would make possible the logging of each such tract in one operation.

During the War and years subsequent much smaller timber was included in the cut than had been previously included.   This change of policy tended to increase the cut approximately 10 per cent.

Up to and including the year 1918 the petitioner took its inventory at market.   The closing inventory for 1918, as was the case with previous inventories, was taken by William L. Martin, who was and had been sales manager for the petitioner for a period of 13 years. In taking inventory it was his practice to consider any orders on hand and to arrive at market on the basis of his general knowledge of the business and of the condition of the market at the time.   He followed the practice of allowing $3 per thousand for loading and handling and 5 per cent for shrinkage and waste, which resulted from degrading at the time of shipping.   The lumber was shipped under an inspector licensed and bonded by the National Hardwood Association, who acted as inspector for both parties and who, being better qualified than the petitioner's inspector, graded more closely. As a result an appreciable amount of the lumber was dropped to grades lower than that in which it was inventoried.

On December 19, 1918, 100,000 feet of 8/4 No. 4 common hardwood narrow sold for $13 per thousand.   Four thousand feet of the same grade were carried in inventory at $10.   In January white maple carried in inventory at $50 per thousand feet sold at $50 and $60 per thousand, averaging $57.50.   Common maple flooring 4/4 No. 1 was carried in inventory at $25 per thousand, and sold on March 21 and April 4 at that price, while on March 22 a quantity was sold at $23, $26, and $31, averaging $30 on inspection.   In May and June 900,000 feet were sold at $18 and $22 per thousand and 19,000 feet at $19.   Five-eighths No. 2 common and better beech carried in inven-tory at $22 sold in April at $30, while 12,000 feet of 5/8 No. 3 com-mon and better beech carried in inventory at $10 later sold at $15.

The closing inventory as shown by the taxpayer on its return was $209,301.   The Commissioner had changed this inventory to $218,-752.02, purporting to be cost on the basis of cost or market, whichever is lower.   The unit cost used in arriving at this figure was average

cost of $25.94 per thousand feet. The taxpayer has submitted an inventory taken at cost or market, whichever is lower, by grades and has arrived at an inventory of $191,563.16. In making this inventory average cost of $25.94 per thousand feet was also used.

## OPINION.

GREEN: The correctness of the deficiency determined by the respondent is dependent upon the correctness of his valuation of petitioner's timber holdings as of March 1, 1913, for the purpose of arriving at the depletion allowance deductible in determining petitioner's net income, and in the correctness of the adjustments made by him in petitioner's closing inventory.

With reference to the valuation the petitioner makes a number of contentions which, if determined in its favor, will make it unnecessary for us to consider whether the valuation is erroneous *per se.* It is the contention of the petitioner that the March 1, 1913, value of its timber was determined by Commissioner Williams on November 27, 1920, and that such determination is final and not subject to review by his successors in office; that the value placed on the timber by Commissioner Williams was approved by Commissioner Blair on or about August 31, 1923, in his determination in respect of petitioner's tax liability for 1917; and further that under the law and regulations no Commissioner has the right to change such valuation once it is made.

The question thus presented is whether the determination by a Commissioner of Internal Revenue of the March 1, 1913, value of timber for the purpose of determining the depletion allowance for any given year, precludes a Commissioner of Internal Revenue from determining a different value for the same timber to be used in the same way in the computation of the tax for another year.

The petitioner relies upon section 234(a)(9) of the Revenue Act of 1918, and article 230 of Regulations 45, which read as follows:

SEC. 234. (a)(9) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case, based upon cost including cost of development not otherwise deducted: *Provided,* That in the case of such properties acquired prior to March 1, 1913, the fair market value of the property (or the taxpayer's interest therein) on that date shall be taken in lieu of cost up to that date: * * * such reasonable allowance in all the above cases to be made under rules and regulations to be prescribed by the Commissioner with the approval of the Secretary. In the case of leases the deductions allowed by this paragraph shall be equitably apportioned between the lessor and lessee.

ART. 230. *Revaluation of timber not allowed.*—In the case of timber acquired prior to March 1, 1913, the fair market value as of that date shall, when de-

termined and approved by the Commissioner, be the basis for determining the depletion deduction for each year during the continuance of the ownership under which the fair market value of the timber was fixed, and during such ownership there shall be no redetermination of the fair market value of the timber for such purpose. However, the unit market (or cost) value of the timber will subsequently be changed if from any cause such unit market (or cost) value, if continued as a basis of depletion, shall upon evidence satisfactory to the Commissioner be found inadequate or excessive for the extinguishment of the cost, or fair market value as of March 1, 1913, of the timber.

It is apparent that the literal application of the regulation would prevent the reconsideration of the March 1, 1913, value of timber regardless of whether the petitioner thought the tax too high or the Commissioner thought it too low. Both would be bound by the value first determined whether it was too high or too low.

This Board will not approve or apply any regulation if it serves to perpetuate from year to year an error made by the Commissioner. The statute imposes upon the Commissioner and this Board the duty of determining the correct amount of tax due. This duty neither the Commissioner nor the Board can perform if either one of them is bound by an error of fact made by either of them in determining the amount of tax due for a preceding year. We have heretofore held that our findings of fact as to one year are not conclusive as to any other year, and we have no hesitation in applying the same rule as to conclusions of fact made by the Commissioner. To hold otherwise would be to perpetuate the error of fact if one were made, and this we will not do.

It is urged in behalf of the petitioner that if the Board should find as we have above that the valuation of this timber made in closing its liability for the prior year is not conclusive, the Board should find on the evidence that the fair market value of the timber as of March 1, 1913, was $10 per thousand feet, log scale, based on the estimate of 86,000,000 feet for Block 1, and $9 per thousand feet for 84,000,000 feet, the amount guaranteed for Block 2. To sustain this claim the petitioner relies on the opinion testimony of William L. Martin, William P. Porter, William L. Saunders, and Charles T. Mitchell.

William L. Martin is, and has been for 20 years or more, secretary and sales manager for the petitioner. Prior to that time he was a dealer in lumber and related products and engaged in logging. His estimate that the timber on Block 1 was worth $10 per thousand on March 1, 1913, and that on Block 2 was worth $9 per thousand was, among other things, based on his belief that petitioner would not have offered the property for sale. He also stated that on or about March 1, 1913, the difference between the sale price of the petitioner's products and cost, stumpage cost omitted, was approximately $10 per thousand feet.

William P. Porter is engaged in the manufacture of lumber in the hardwood belt of the lower peninsula of Michigan with the East Jordan Lumber Co. and has been engaged in that business in the same locality for a period of more than 30 years. Although he has been on Block 1 a number of times, he had never been there for the purpose of forming an opinion as to value. His estimate of March 1, 1913, value of $10 per thousand feet for timber on Block 1 and $9 per thousand feet for timber on Block 2 was based not on an actual valuation by him of the timber of these tracts, but on his general knowledge as to values in the hardwood belt. His opinion was given in response to a question stating the number of acres in each tract, actual cut, log scale, therefrom and the percentage of the total cut represented by each of the species of timber taken from the two tracts. The statement did not give the dates when the timber was cut.

William L. Saunders has been engaged in logging and lumbering operations in Michigan for a period of 45 years and for 30 years of that time he has been manager of the Cummer-Diggins Co. of Cadillac. In this capacity he was generally familiar with conditions in the hardwood belt of the lower peninsula. Following are the questions asking his opinion as to the March 1, 1913, value of petitioner's timber and his answers thereto:

Q. I call your attention to the fact, Mr. Saunders, that yesterday the testimony of Mr. William L. Martin disclosed that in Block 1 of Boyne City Lumber Company's timber, there were 7,080 acres, which have cut out 96,594,000 feet of logs, log scale, the percentage being 63.77% of maple; 5.35% basswood, 3.59% beech, 19.69% elm, 7.19% hemlock, and the balance scattering, and ask you what, in your opinion, was the fair market value per thousand foot log scale of stumpage in Block 1 of Boyne City Lumber Company timber as of March 1, 1913?

A. My judgment would be at that time timber cutting that percentage of maple was worth $11.

Q. By that you mean per thousand foot, log scale?

A. Yes, sir.

Q. I call your attention to the testimony of Mr. Martin given yesterday with reference to the cut on Boyne City Lumber Company, Block 2, there being in that block 6,000 acres of timbered land, from which there were taken 60,353,000 feet of logs, log scale. The percentage of species being 37.60% maple, 4.21% basswood, 20.34% beech, 1.14% elm, 5.50% pine, 29.30% hemlock, and the balance miscellaneous, and I also call your attention to the fact that according to the testimony of Mr. Martin that timber was located as shown by the blueprint map, and that while the railroad of the Boyne City-Gaylor-Alpena had not been built through the timber in 1913, there was an agreement in effect made in 1910 that the road would be built through in 1913, as soon as the same was to be logged, and ask you, based on those facts and your knowledge of the market value of hardwood stumpage in Michigan, what, in your opinion, was the fair market value of that stumpage as of March 1, 1913?

A. The locality considered and the lesser amount of maple, my judgment is that there would be two dollars per thousand different in the value, or nine dollars per thousand.

Charles T. Mitchell has been engaged in the lumber business since 1898, and a great part, if not all, of his operations have been in the hardwood belt in which petitioner's holdings were located. His opinion that the March 1, 1913, value of the timber on Block 1 was $11 per thousand and that of the timber on Block 2 was $10, was given in response to questions that, in effect, were the same as those put to William P. Porter and William L. Saunders. He had visited both tracts but did not base his opinion on any particular impressions gained from these visits as to quality of the timber, but on his belief that all hardwood timber in that section was of that value. The difference in his valuation of these two tracts was attributable to the large percentage of hemlock on Block 2.

These witnesses are men of wide experience in the hardwood belt in which the petitioner's timber was located, and their opinions are entitled to serious consideration in arriving at the March 1, 1913, value of such timber. However, such opinions must be considered in the light of all the evidence which has a bearing on such value, and particularly with reference to the sales by the Ward Estate in 1912 and 1914.

Although the Ward holdings were sold in parcels averaging approximately 1,000 acres per tract, we believe that under the conditions existing in that locality at the time of the sale and the manner in which the parcels were laid out, these sales, taken as a whole, were fairly indicative of the value of the hardwood timberlands of the lower peninsula. At that time the Ward Estate owned practically all of the hardwood timber in that section which was not already owned by operators. The large operators were naturally interested in supplementing their holdings in order to prolong their run and the small operators were desirous of getting as much of such timber as they could handle. Furthermore, the fact that the parcels were all laid out so that each parcel had average timber and so that the slope and the railroad facilities were especially conducive to economic and expeditious logging made them attractive to operators, both large and small.

Parcels A to G, inclusive, and X and Y taken together constituted a block of timber slightly larger than Block 1, but which was readily comparable, while Parcel Z, adjoining Block 1, was of the same general character. Using the average cut of 14,273 feet, log scale, per acre from A, F, G, and Y, after allowing for 250,000 feet left standing on F, as the basis, and allowing $2.50 per acre in transactions where the land was sold, the number of acres in each tract, the sale prices, the amounts cut from each parcel, sale price

of timber per acre, and sale price of timber per thousand feet, log scale, are shown as follows:

| Parcel | Acres | Sale price of timber allowing $2.50 per acre for land | Cut | Sale price of timber per acre | Sale price of timber per M feet |
|---|---|---|---|---|---|
| X | 2,350 | $266,000 | 33,541,550 | $113.19 | $7.93 |
| Y | 280 | 33,250 | 3,531,085 | 118.75 | 9.42 |
| Z | 1,260 | 138,000 | 17,983,980 | 109.52 | 7.67 |
| A | 320 | 38,200 | 5,015,857 | 119.37 | 7.61 |
| B | 1,477 | 96,307 | 21,081,221 | 65.20 | 4.57 |
| C | 480 | 34,800 | 6,851,040 | 72.50 | 5.08 |
| D | 1,000 | 92,500 | 14,273,000 | 92.50 | 6.48 |
| E | 1,080 | 101,300 | 15,414,840 | 93.80 | 6.57 |
| F | 1,060 | 92,350 | 15,175,000 | 87.12 | 6.09 |
| G | 960 | 92,600 | 13,424,620 | 96.46 | 6.90 |

By dividing the total sale price of the parcels listed by the total cut as shown, we find that the Ward timber sold for $6.74 per thousand feet, log scale. The record further shows that Parcels A to G, inclusive, were cruised and estimated by E. J. Brogan in or near 1913 and by the Kneeland-Bigelow Co. some time prior to June, 1914. The total cut on these tracts, together with the two estimates mentioned which were purported to be 100 per centum estimates, are given as follows:

| Parcel | Actual cut in feet | Brogan estimate | Kneeland-Bigelow estimate |
|---|---|---|---|
| A | 5,015,857 | 3,979,000 | 3,999,000 |
| B | 21,081,221 | 12,278,000 | 12,438,000 |
| C | 6,851,040 | 3,619,000 | 3,214,000 |
| D | 14,273,000 | 9,187,000 | 10,734,000 |
| E | 15,414,840 | 12,630,000 | 11,749,000 |
| F | 15,175,000 | 10,064,000 | 10,784,000 |
| G | 13,424,620 | 9,677,000 | 9,368,000 |

An average of the estimates as compared to the actual cut shows a percentage of about 66⅔. This indicates that at or about March 1, 1913, the estimates on which timberlands were bought was about 66⅔ per centum of what such lands eventually produced, the difference being due in part to increased utilization, growth and merchantability.

Timber is unlike other natural resources in that the entire reserve at any date is visible to the eye and susceptible of measurement. Therefore, the quantity of timber on a given tract at March 1, 1913, is a fact which could have been determined at the time, and any evidence subsequently obtained as to such quantity should be considered in determining the reserve on that date.

The petitioner has claimed a reserve of 86,000,000 feet on Block 1, and 84,000,000 feet on Block 2. The actual cut resulted in 96,596,000 feet on Block 1 and 60,353,000 feet on Block 2. Reducing

this actual cut to the percentage shown by the Brogan and Kneeland-Bigelow estimates, the result indicates that a timber cruiser would have estimated 64,396,000 feet on Block 1 and 40,235,000 feet on Block 2. Applying to these estimates the average rate a thousand of $9.18 as shown by the petitioner based on E. J. Brogan's estimates, the value of Block 1 would be $591,155 for land and timber and the value of Block 2 would be $369,362 for land and timber. If these amounts are reduced by the land values, which are not in dispute, the result would be $552,655 for Block 1, and $334,162 for Block 2. However, it was generally admitted by the parties to this appeal and by the witnesses that Block 1 was worth about $1 a thousand more than Block 2, on account of the difference in species. In fact, Parcel Z, which adjoins Block 1, had a sale price of $7.67 a thousand, as compared with the average of $6.74 a thousand which indicates about $1.40 a thousand difference based on the estimate of 64,396,000 feet. Therefore, Block 1 would have a value of about $642,809 from this comparison.

The petitioner has contended that Block 1 should be valued on the basis of $10 a thousand and Block 2 at $9 a thousand, and several witnesses have testified to these values. These witnesses were familiar with timber in this section in 1913, and presumably were applying the same method of valuation used at that time by timbermen. If we apply these unit rates to the quantities of timber on the two blocks, which it is indicated would have been estimated at that time, we have a value for Block 1 of $643,960 and for Block 2 of $362,115.

It is contended, however, that the Ward sales and particularly those sales made on August 4, 1914, were not normal sales and were not indicative of fair market value because of the unsettled condition of the money market brought about by the outbreak of the World War. We believe, however, that we may make some allowance for such conditions and still find that the price at which the Ward timber was sold is indicative of the fair market value of petitioner's timber as of March 1, 1913, since the record discloses other facts which tend to show that the Ward sales were normal sales even though the money market was unsettled; also that the petitioner's holdings under the same conditions were of less value than the Ward properties. We have already mentioned the fact that the Ward timber was the last of the lower peninsula hardwood obtainable. It also appears that a very representative group of operators attended the sale on August 4, for the purpose of procuring some of this timber, if possible. The record shows that the run of timber on these tracts was better than on Block 1 and the slope on each parcel was an aid in logging operations, and that most of the timber could be more easily reached from the railroad. The record also discloses that the peti-

tioner's holdings were logged much more closely than Parcels A, F, G, and Y, and that the cut from Block 1 averaged 13,643 feet, log scale, per acre while that from Block 2 averaged only 8,477 feet as compared with an average of 14,273 feet, log scale, from the four parcels just named. With reference to Y, it appears that in the windblown area some 4 to 8 feet of each tree was left on the ground. Also that Y was logged in 1913 or 1914, when larger trees were left standing than were left during the war years, when most of the petitioner's timber was cut.

From an examination of the questions asked the taxpayer's witnesses, named above, it is apparent that the facts mentioned in the preceding paragraph were not stated, and the opinions as to value given in response thereto do not reflect consideration of such facts. These questions do not show whether the cut from the petitioner's holdings was made under conditions existing in 1913 and 1914, or during the war years, neither do they take into consideration the logging facilities of these two tracts as compared with other tracts, nor the fact that the Boyne City properties were logged much more closely than other tracts in the hardwood belt.

Our attention has been called to the fact that the petitioner realized material sums from the sale of chemical wood, and that no depletion on such products has been claimed. In this case, it is sufficient to say that it is apparent from the record that it has never been the practice in purchasing timber in that section of the country to figure the chemical wood separately from the saw timber, but if the facilities were such that there was a ready market for such products, any added value on that account merely served to increase the value attributed to the saw timber. The same is true with reference to the computation of depletion of the properties. In the case of the Ward properties, the sale carried with it the chemical wood and the same outlet was open to the purchasers as in the case of the petitioner. In arriving at the unit sale price of the Ward timber, we have followed the practice prevailing, which is that of attributing total sale price to saw timber only.

Taking all of the facts into consideration we are of the opinion that the testimony not only fails to show that the Commissioner's determination of the fair market values of the two tracts in question were erroneous, but on the contrary tends to confirm such values. Accordingly, the following values at March 1, 1913, are approved:

Block 1:
| | | |
|---|---|---|
| Land, 15,408 acres | | $38,500.00 |
| Timber, 96,593,607 feet | | 634,620.00 |

Block 2:
| | | |
|---|---|---|
| Land, 7,040 acres | | 35,200.00 |
| Timber, 60,352,811 feet | | 324,094.60 |

At the hearing of this case the respondent set up a new contention to the effect that the petitioner prior to the agreement with the W. H. White Co., on February 18, 1915, held Block 2 as mortgagee, that it acquired full rights to Block 2 under the agreement mentioned, and since the date of said agreement was subsequent to March 1, 1913, the proper basis for determining depletion is cost, instead of value as of March 1, 1913.

It may be said to begin with that the contract of February 1, 1910, and the deeds of conveyance executed a few days before do not support any such claim. The deeds were absolute in form and following. their execution the contract of February 1, 1910, was signed, which clearly did not give a right of redemption to the W. H. White Co. Since the parties saw fit to enter into a contract covering the transfer of these properties to the petitioner, it is hardly likely that so important a feature as the right of the transferor to redeem the property would be omitted, and in the absence of very clear proof that such was the case we are not justified in making such a finding. The written instruments indicate that so far as the W. H. White Co. was concerned, it had parted with all of its rights with reference to the property and all of these rights, with the additional right to require at its own option the W. H. White Co. to repurchase within a given time, had vested in the petitioner. There was some testimony by William L. Martin, secretary of the petitioner, which testimony was later modified by him, that there was an oral understanding that the W. H. White Co. would have the right to redeem. We do not feel, however, that this testimony alone is sufficient to prove, in the face of the written instruments, that the conveyance of the property to the petitioner was not absolute. We therefore find that depletion of Block 2 was properly based on its value as of March 1, 1913.

The taxpayer's return for 1918 was based on a closing inventory taken at market, which inventory conformed to the practice of the petitioner for all years prior thereto. It was taken by William L. Martin, who had been sales manager for the petitioner for a period of 13 years. In taking inventory it was his practice to consider any orders on hand for the sale of lumber and to arrive at market on the basis of his general knowledge of the lumber business and the condition of the market at the time the inventory was taken. In arriving at the market price allowance was made for sales expense, discounts and office overhead. Three dollars per thousand feet was allowed for loading and handling and 5 per cent for shrinkage and waste. This allowance was explained by the fact that all lumber shipped from the mill was shipped under the direction of an inspector licensed and bonded by the National Hardwood Association, who acted as inspector for both vendor and vendee. This

inspection was much closer than that made by the petitioner's mill inspectors, and in taking inventory the petitioner has consistently followed the practice of allowing 5 per cent for degrading. On this basis petitioner's closing inventory for 1918 was $209,301.

The respondent has taken the position that this method of taking inventory is contrary to the provisions of section 203 of the Revenue Act of 1918 and regulations thereunder. Section 203 reads as follows:

That whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Under the provisions of section 203, the following article of Regulations 45 was promulgated:

ART. 1582. *Valuation of inventories.*—Inventories must be valued at (a) cost or (b) cost or market, as defined in article 1584 as amended, whichever is lower. (See article 1585 for inventories by dealers in securities.) Whichever basis is adopted must be applied consistently to the entire inventory. A taxpayer may, regardless of his past practice, adopt the basis of "cost or market whichever is lower," for his 1920 inventory, provided a disclosure of the fact and that it represents a change is made in the return. Thereafter changes can be made only after permission is secured from the Commissioner. Inventories should be recorded in a legible manner, properly computed and summarized, and should be preserved as a part of the accounting records of the taxpayer. Goods taken in the inventory which have been so intermingled that they can not be identified with specific invoices will be deemed to be the goods most recently purchased.

Under authority of the above section of the Act, and article of Regulations 45, the respondent has adjusted inventory to what is alleged to be cost or market, whichever is lower, and has arrived at a closing inventory of $218,752.02, purporting to be cost. The petitioner has countered with a claim that if the inventory is to be taken at cost or market, whichever is lower, the inventory should be taken by grades, and since there is no method of determining actual costs by grades, it seeks to arrive at cost or market, whichever is lower, by using average cost, thereby bringing about the result that the lower grades of lumber are taken at market and the higher grades at cost.

It is argued with a great deal of force that any attempt on the part of the petitioner to take its inventory by grades is necessarily erroneous, in view of the fact that it is impossible to determine actual cost of lumber by grades, and, that being true, the only way that inventory can be taken so as to comply with the regulations is by comparing total cost with total market. It is also contended, and we believe there is ground for the contention, that average cost and

true cost of lumber by grades differs widely and any inventory taken by grades on average cost or market, whichever is lower, is necessarily erroneous. The basis for the argument that average cost and true cost vary is that a log producing several grades of lumber is brought to the mill and manufactured for the purpose of procuring the better grades, and that the lower grades would not be brought in at all if there were any way of eliminating such grades in the woods, or, in other words, a log containing only lower grades of lumber would never be cut and brought to the saw because the expense of such operation would exceed the return therefrom. The only reason a plank of lumber of inferior grade does not go into the burner directly from the saw is because the cost of manufacturing and handling such lumber from the saw to market is less than the price for which it can be sold, even though such price is much less than average cost. From this it is contended that cost of the inferior grades actually begins at the saw and that prior cost is attributable to the higher grades of lumber, since it is only because of the higher grades that the log is cut and brought to the saw to begin with. However, we only mention these arguments for the purpose of giving a complete picture of the case, since there are other factors which we believe are determinative of the question regarding inventory. In our opinion in the *Appeal of The Buss Co.*, 2 B. T. A. 266, we said:

However faulty the taxpayer's inventory method was, we believe that greater weight should be given to consistency than to any particular method of inventorying or basis of valuation so long as the method or basis used substantially reflects the income.

This language is applicable to this case. The taxpayer consistently took its inventory at market. The respondent has computed a deficiency and in that computation has changed the closing inventory to what is alleged to be cost or market, whichever is lower, but has made no corresponding change in the opening inventory. The *Appeal of Sinsheimer Bros., Inc.*, 5 B. T. A. 918, is directly in point. In that case the petitioner had inventoried beans and grain at market. The Commissioner rejected the closing inventory and redetermined it on the basis of alleged cost, whereas he accepted opening inventory, which was admittedly taken at market. In our opinion, we said:

The inventory practice of the petitioner is undoubtedly faulty, but it can not be said that net income has not been clearly and correctly stated in the return because of the use of those inventories. The opening and closing inventories of the year 1920 have been determined by the petitioner according to a uniform basis of valuation. The error in the basis of valuation is present in both inventories, thus preventing any distortion in the net income for that year. On the other hand, the Commissioner, by accepting petitioner's opening inventory for the year 1920 and restating the bean and grain inventory, at the close

of the same year, at cost, has retained the error in the petitioner's basis of valuation so far as it affects the opening inventory and eliminated it as it affects the closing inventory. The result necessarily is a distorted net income.

From these cases it appears that income is more nearly reflected by the petitioner's consistent, though faulty, method of taking inventory than would be reflected by the inconsistent closing inventory contended for by the respondent, even though it be conceded that such closing inventory is technically correct. See also *Appeal of Thomas Shoe Co.*, 1 B. T. A. 124.

The respondent contends that the petitioner's closing inventory does not reflect fair market value as of the date of inventory. This contention is based solely on the testimony of William L. Martin on cross-examination with reference to sales of lumber taking place from December, 1918, to June, 1919. The sales disclosed by this testimony covered only a very few of the grades of lumber covered by the inventory and although some of the sales tend to show that the fair market value of the lumber was higher than that shown in the inventory, other sales tend to show that the value was less. There is no evidence in the record sufficient to show that the inventory, taken by the sales manager, in accordance with the petitioner's established practice, on the basis of his experience and knowledge of the business and of the condition of the market, does not represent fair market value at the time of inventory.

> *Judgment will be entered on 15 days' notice, under Rule 50.*