*49 OPINION.
Green:
The correctness of the deficiency determined by the respondent is dependent upon the correctness of his valuation of petitioner’s timber holdings as of March 1, 1913, for the purpose of arriving at the depletion allowance deductible in determining petitioner’s net income, and in the correctness of the adjustments made by him in petitioner’s closing inventory.
With reference to the valuation the petitioner makes a number of contentions which, if determined in its favor, will make it unnecessary for us to consider whether the valuation is erroneous per se. It is the contention of the petitioner that the March 1, 1913, value of its timber was determined by Commissioner Williams on November 27, 1920, and that such determination is final and not subject to review by his successors in office; that the value placed on the timber by Commissioner Williams was approved by Commissioner Blair on or about August 31, 1923, in his determination in respect of petitioner’s tax liability for 1917; and further that under the law and regulations no Commissioner has the right to change such valuation once it is made.
The question thus presented is whether the determination by a Commissioner of Internal Eevenue of the March 1, 1913, value of timber for the purpose of determining the depletion allowance for any given year, precludes a Commissioner of Internal Eevenue from determining a different value for the same timber to be used in the same way in the computation of the tax for another year.
The petitioner relies upon section 234(a) (9) of the Eevenue Act of 1918, and article 230 of Eegulations 45, which read as follows:
Sec. 234. (a) (9) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case, based upon cost including cost of development not otherwise deducted: Provided, That in the case of such properties acquired prior to March 1, 1913, the fair market value of the property (or the taxpayer’s interest therein) on that date shall be taken in lieu of cost up to that date: * * * such reasonable allowance in all the above cases to be made under rules and regulations to be prescribed by the Commissioner with the approval of the Secretary. In the case of leases the deductions allowed by this paragraph shall be equitably apportioned between the lessor and lessee.
Art. 230. Revaluation of timber not allowed. — In the ease of timber acquired prior to March 1, 1913, the fair market value as of that date shall, when de *50 termined and approved by tbe Commissioner, be tbe basis for determining tbe depiction deduction for each year during tbe continuance of the ownership under which tbe fair market value of the timber was fixed, and during such ownership there shall be no redetermination of the fair market value of the timber for such purpose. However, the unit market (or cost) value of the timber will subsequently be changed if from any cause such unit market (or cost) value, if continued as a basis of depletion, shall upon evidence satisfactory to the Commissioner be ftmnd inadequate or excessive for the extinguishment of the cost, or fair market value as of March 1, 1913, of the timber.
It is apparent that the literal application of the regulation would prevent the reconsideration of the March 1, 1913, value of timber regardless of whether the petitioner thought the tax too high or the Commissioner thought it too low. Both would be bound by the value first determined whether it was too high or too low.
This Board will not approve or apply any regulation if it serves to perpetuate from year to year an error made by the Commissioner. The statute imposes upon the Commissioner and this Board the duty of determining the correct amount of tax due. This duty neither the Commissioner nor the Board can perform if either one of them is bound by an error of fact made by either of them in determining the amount of tax due for a preceding year. We have heretofore held that our findings of fact as to one year are not conclusive as to any other year, and we have no hesitation in applying the same rule as to conclusions of fact made by the Commissioner. To hold otherwise would be to perpetuate the error of fact if one were made, and this we will not do.
It is urged in behalf of the petitioner that if the Board should find as we have above that the valuation of this timber made in closing its liability for the prior year is not conclusive, the Board should find on the evidence that the fair market value of the timber as of March 1, 1913, was $10 per thousand feet, log scale, based on the estimate of 86,000,000 feet for Block 1, and $9 per thousand feet for 84,000,000 feet, the amount guaranteed for Block 2. To sustain this claim the petitioner relies on the opinion testimony of William L. Martin, William P. Porter, William L.'Saunders, and Charles T. Mitchell.
William L. Martin is, and has been for 20 years or more, secretary and sales manager for the petitioner. Prior to that time he was a dealer in lumber and related products and engaged in logging. His estimate that the timber on Block 1 was worth $10 per thousand on March 1, 1913, and that on Block 2 was worth $9 per thousand was, among other things, based on his belief that petitioner would not have offered the property for sale. He also stated that on or about March 1, 1913, the difference between the sale price of the petitioner’s products and cost, stumpage cost omitted, was approximately $10 per thousand feet.
*51 William P. Porter is engaged in the manufacture of lumber in the hardwood belt of the lower peninsula of Michigan with the East Jordan Lumber Co. and has been engaged in that business in the same locality for a period of more than 30 years. Although he has been on Block 1 a number of times, he had never been there for the purpose of forming an opinion as to value. His estimate of March 1, 1913, value of $10 per thousand feet for timber on Block 1 and $9 per thousand feet for timber on Block 2 was based not on an actual valuation by him of the timber of these tracts, but on his general knowledge as to values in the hardwood belt. His opinion was given in response to a question stating the number of acres in each tract, actual cut, log scale, therefrom and the percentage of the total cut represented by each of the species of timber taken from the two tracts. The statement did not give the dates when the timber was cut.
.William L. Saunders has been engaged in logging and lumbering operations in Michigan for a period of 45 years and for 30 years of that time he has been manager of the Cummer-Diggins Co. of Cadillac. In this capacity he was generally familiar with conditions in the hardwood belt of the lower peninsula. Following are the questions asking his opinion as to the March 1, 1913, value of petitioner’s timber and his answers thereto:
Q. X call your attention to the fact, Mr. Saunders, that yesterday the testimony of Mr. William L. Martin disclosed that in Block 1 of Boyne City Lumber Company’s timber, there were 7,080 acres, which have cut out 96,594,000 feet of logs, log scale, the percentage being 63.77% of maple; 5.35% basswood, 3.59% beech, 19.69% elm, 7.19% hemlock, and the balance scattering, and ask you what, in your opinion, was the fair market value per thousand foot log scale of stumpage in Block 1 of Boyne City Lumber Company timber as of March 1, 1913?
A. My judgment would be at that time timber cutting that percentage of maple was worth $11.
Q. By that you mean per thousand foot, log scale?
A.' Yes, sir.
Q. I call your attention to the testimony of Mr. Martin given yesterday with reference to the cut on Boyne City Lumber Company, Block 2, there being in that block 6,000 acres of timbered land, from which there were taken 60,353,000 feet of logs, log scale. The percentage of species being 37.60% maple, 4.21% basswood, 20.34% beech, 1.14% elm, 5.50% pine, 29.30% hemlock, and the balance miscellaneous, and I also call your attention to the fact that according to the testimony of Mr. Martin that timber was located as shown by the blueprint map, and that while the railroad of the Boyne City-Gaylor-Alpena had not been built through the timber in 1913, there was an' agreement in effect made in 1910 that the road would be built through in 1913, as soon as the same was to be logged, and ask you, based on those facts and your knowledge of the market value of hardwood stumpage in Michigan, what, in your opinion, was the fair market value of that stumpage as of March 1, 1913?
*52 A. Tlie locality considered and the lesser amount of maple, my judgment is that there would be two dollars per thousand different in the value, or nine dollars per thousand.
Charles T. Mitchell has been engaged in the lumber business since 1898, and a great part, if not all, of his operations have been in the hardwood belt in which petitioner’s holdings were located. His opinion that the March 1, 1918, value of the timber on Block 1 was $11 per thousand and that of the timber on Block 2 was $10, was given in response to questions that, in effect, were the same as those put to William P. Porter and William L. Saunders. He had visited both tracts but did not base his opinion on any particular impressions gained from these visits as to quality of the timber, but on his belief that all hardwood timber in that section was of that value. The difference in his valuation of these two tracts was attributable to the large percentage of hemlock on Block 2.
These witnesses are men of wide experience in the hardwood belt in which the petitioner’s timber was located, and their opinions are entitled to serious consideration in arriving at the March 1, 1918, value of such timber. However, such opinions must be considered in the light of all the evidence which has a bearing on such value, and particularly with reference to the sales by the Ward Estate in 1912 and 1914.
Although the Ward holdings were sold in parcels averaging approximately 1,000 acres per tract, we believe that under the conditions existing in that locality at the time of the sale and the manner in which the parcels were laid out, these sales, taken as a whole, were fairly indicative of the value of the hardwood timberlands of the lower peninsula. At that time the Ward Estate owned practically all of the hardwood timber in that section which was not already owned by operators. The large operators were naturally interested in supplementing their holdings in order to prolong their run and the small operators were desirous of getting as much of such timber as they could handle. Furthermore, the fact that the parcels were all laid out so that each parcel had average timber and so that the slope and the railroad facilities were especially conducive to economic and expeditious logging made them attractive to operators, both large and small.
Parcels A to G, inclusive, and X and Y taken together constituted a block of timber slightly larger than Block 1, but which was readily comparable, while Parcel Z, adjoining Block 1, was of the same general character. Using the average cut of 14,273 feet, log scale, per acre from A, F, G, and Y, after allowing for 250,000 feet left standing on F, as the basis, and allowing $2.50 per acre in transactions where the land was sold, the number of acres in each tract, the sale prices, the amounts cut from each parcel, sale price *53 of timber per acre, and sale price of timber per thousand feet, log scale, are shown as follows:
[[Image here]]
By dividing the total sale price of the parcels listed by the total cut as shown, we find that the Ward timber sold for $6.74 per thousand feet, log scale. The record further shows that Parcels A to G, inclusive, were cruised and estimated by E. J. Brogan in or near 1913 and by the Kneeland-Bigelow Co. some time prior to June, 1914. The total cut on these tracts, together with the two estimates mentioned which were purported to be 100 per centum estimates, are given as follows:
[[Image here]]
An average of the estimates as compared to the actual cut shows a percentage of about 66%. This indicates that at or about March 1, 1913, the estimates on which timberlands were bought was about 66% per centum of what such lands eventually produced, the difference being due in part to increased utilization, growth and merchantability.
Timber is unlike other natural resources in that the entire reserve at any date is visible to the eye and susceptible of measurement. Therefore, the quantity of timber on a given tract at March 1, 1913, is a fact which could have been determined at the time, and any evidence subsequently obtained as to such quantity should be considered in determining the reserve on that date.
The petitioner has claimed a reserve of 86,000,000 feet on Block 1, and 84,000,000 feet on Block 2. The actual cut resulted in 96,596,000 feet on Block 1 and 60,353,000 feet on Block 2. Reducing *54 this actual cut to the percentage shown by the Brogan and Kneeland-Bigelow estimates, the result indicates that a timber cruiser would have estimated 64,396,000 feet on Block 1 and 40,235,000 feet on Block 2. Applying to these estimates the average rate a thousand of $9.18 as shown by the petitioner based on E. J. Brogan’s estimates, the value of Block 1 would be $591,155 for land and timber and the value of Block 2 would be $369,362 for land and timber. If these amounts are reduced by the land values, which are not in dispute, the result would be $552,655 for Block 1, and $334,162 for Block 2. However, it was generally admitted by the parties to this appeal and by the witnesses that Block 1 was worth about $1 a thousand more than Block 2, on account of the difference in species. In fact, Parcel Z, which adjoins Block 1, had a sale price of $7.67 a thousand, as compared with the average of $6.74 a thousand which indicates about $1.40 a thousand difference based on the estimate of 64,396,000 feet. Therefore, Block 1 would have a value of about $642,809 from this comparison.
The petitioner has contended that Block 1 should be valued on the basis of $10 a thousand and Block 2 at $9 a thousand, and several witnesses have testified to these values. These witnesses were familiar with timber in this section in 1913, and presumably were applying the same method of valuation used at that time by timber-men. If we apply these unit rates to the quantities of timber on the two blocks, which it is indicated would have been estimated at that time, we have a value for Block 1 of $643,960 and for Block 2 of $362,115.
It is contended, however, that the Ward sales and particularly those sales made on August 4, 1914, were not normal sales and were not indicative of fair market value because of the unsettled condition of the money market brought about by the outbreak of the World War. We believe, however, that we may make some allowance for such conditions and still find that the price at which the Ward timber was sold is indicative of the fair market value of petitioner’s timber as of March 1, 1913, since the record discloses other facts which tend to show that the Ward sales were normal sales even though the money market was unsettled; also that the petitioner’s holdings under the same conditions were of less value than the Ward properties. We have already mentioned the fact that the Ward timber was the last of the lower peninsula hardwood obtainable. It also appears that a very representative group of operators attended the sale on August 4, for the purpose of procuring some of this timber, if possible. The record shows that the run of timber on these tracts was better than on Block 1 and the slope on each parcel was an aid in logging operations, and that most of the timber could be more easily reached from the railroad. The record also discloses .that the peti *55 tioner’s holdings were logged much more closely than Parcels A, F, G, and Y, and that the cut from Block 1 averaged 18,643 feet, log scale, per acre while that from Block 2 averaged only 8,477 feet as compared with an average of 14,273 feet, log scale, from the four parcels just named. With reference to Y, it appears that in the windblown area some 4 to 8 feet of each tree was left on the ground. Also that Y was logged in 1913 or 1914, when larger trees were left standing than were left during the war years, when most of the petitioner’s timber was cut.
From an examination of the questions asked the taxpayer’s witnesses, named above, it is apparent that the facts mentioned in the preceding paragraph were not stated, and the opinions as to value given in response thereto do not reflect consideration of such facts. These questions do not show whether the cut from the petitioner’s holdings was made under conditions existing in 1913 and 1914, or during the war years, neither do they take into consideration the logging facilities of these two tracts as compared with other tracts, nor the fact that the Boyne City properties were logged much more closely than other tracts in the hardwood belt.
Our attention has been called to the fact that the petitioner realized material sums from the sale of chemical wood, and that no depletion on such products has been claimed. In this case, it is sufficient to say that it is apparent from the record that it has never been the practice in purchasing timber in that section of the country to figure the chemical wood separately from the saw timber, but if the facilities were such that there was a ready market for such products, any added value on that account merely served to increase the value attributed to the saw timber. The same is true with reference to the computation of depletion of the properties. In the case of the Ward properties, the sale carried with it the chemical wood and the same outlet was open to the purchasers as in the case of the petitioner. In arriving at the unit sale price of the Ward timber, we have followed the practice prevailing, which is that of attributing total sale price to saw timber only.
Taking all of the facts into consideration we are of the opinion that the testimony not only fails to show that the Commissioner’s determination of the fair market values of the two tracts in question were erroneous, but on the contrary tends to confirm such values. Accordingly, the following values at March 1, 1913, are approved:

Block 1:

Land, 15,408 acres-$38, 500. 00
Timber, 96,593,607 feet- 634,620.00

Block 2:

Land, 7,040 acres_ 35,200.00
Timber, 60,352,811 feet_1_ 324,094. 60
*56 At the hearing of this case the respondent set np a new contention Co the effect that the petitioner prior to the agreement with the W. H. White Co., on February 18, 1915, held Block 2 as mortgagee, that it acquired full rights to Block 2 under the agreement mentioned, and since the date of said agreement was subsequent to March L, 1913, the proper basis for determining depletion is cost, instead of value as of March 1, 1913.
It may be said to begin with that the contract of February 1, 1910, and the deeds of conveyance executed a few days before do not support any such claim. The deeds were absolute in form and following. their execution the contract of February 1, 1910, was signed, which clearly did not give a right of redemption to the W. H.. White Go. Since the parties saw fit to enter into a contract covering the transfer of these properties to the petitioner, it is hardly likely that so important a feature as the right of the transferor to redeem the property would be omitted, and in the absence of very clear proof that such was the case we are not justified in making such a finding. The written instruments indicate that so far as the W. H. White Co. was concerned, it had parted with all of its rights with reference to the property and all of these rights, with the additional right to require at its own option the W. H. White Co. to repurchase within a given time, had vested in the petitioner. There was some testimony by William L. Martin, secretary of the petitioner, which testimony was later modified by him, that there was an oral understanding that the W. H. White Co. would have the right to redeem. We do not feel, however, that this testimony alone is sufficient to prove, in the face of the written instruments, that the conveyance of the property to the petitioner was not absolute. We therefore find that depletion of Block 2 was properly based on its value as of March 1, 1913.
The taxpayer’s return for 1918 was based on a closing inventory taken at market, which inventory conformed to the practice of the petitioner for all years prior thereto. It was taken by William L. Martin, who had been sales manager for the petitioner for a period of 13 years. In taking inventory it was his practice to consider any orders on hand for the sale of lumber and to arrive at market on the basis of his general knowledge of the lumber business and the condition of the market at the time the inventory was taken. In arriving at the market price allowance was made for sales expense, discounts and office overhead. Three dollars per thousand feet was allowed for loading and handling and 5 per cent for shrinkage and waste. This allowance was explained by the fact that all lumber shipped from the mill was shipped under the direction of an inspector licensed and bonded by the National Hardwood Association, who acted as inspector for both vendor and vendee. This *57 inspection was much closer than that made by the petitioner’s mill inspectors, and in taking inventory the petitioner has consistently followed the practice of allowing 5 per cent for degrading. On this basis petitioner’s closing inventory for 1918 was $209,301.
The respondent has taken the position that this method of taking inventory is contrary to the provisions of section 203 of the Revenue Act of 1918 and regulations thereunder. Section 203 reads as follows:
That whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.
Under the provisions of section 203, the following article of Regulations 45 was promulgated:
Art. 1582. Valuation of inventories. — Inventories must be valued at (a) cost or (6) cost or market, as defined in article 1584 as amended, whichever is lower. (See article 1585 for inventories by dealers in securities.) Whichever basis is adopted must be applied consistently to the entire inventory. A taxpayer may, regardless of his past practice, adopt the basis of “cost or market whichever is lower,” for his 1920 inventory, provided á disclosure of the fact and that it represents a change is made in the return. Thereafter changes can be made only after permission is secured from the Commissioner. Inventories should be recorded in a legible manner, properly computed and summarized, and should be preserved as a part of the accounting records of the taxpayer. Goods taken in the inventory which have been so intermingled that they can not be identified with specific invoices will be deemed to be the goods most recently purchased.
Under authority of the above section of the Act, and article of Regulations 45, the respondent has adjusted inventory to what is alleged to be cost or market, whichever is lower, and has arrived at a closing inventory of $218,752.02, purporting to be cost. The petitioner has countered with a claim that if the inventory is to be taken at cost or market, whichever is lower, the inventory should be taken by grades, and since there is no method of determining actual costs by grades, it seeks to arrive at cost or market, whichever is lower, by using average cost, thereby bringing about the result that the lower grades of lumber are taken at market and the higher grades at cost.
It is argued with a great deal of force that any attempt on the part of the petitioner to take its inventory by grades is necessarily erroneous, in view of the fact that it is impossible to determine actual cost of lumber by grades, and, that being true, the only way that inventory can be taken so as to comply with the regulations is by comparing total cost with total market. It is also contended, and we believe there is ground for the contention, that average cost and *58 true cost of lumber by grades differs widely and any inventory taken by grades on average cost or market, whichever is lower, is necessarily erroneous. The basis for the argument that average cost and true cost vary is that a log producing several grades of lumber is brought to the mill and manufactured for the purpose of procuring the better grades, and that the lower grades would not be brought in at all if there were any way of eliminating such grades in the woods, or, in other words, a log containing only lower grades of lumber would never be cut and brought to the saw because the expense of such operation would exceed the return therefrom. The only reason a plank of lumber of inferior grade does not go into the burner directly from the saw is because the cost of manufacturing and handling such lumber from the saw to market is less than the price for which it can be sold, even though such price is much less than average cost. From this it is contended that cost of the inferior grades actually begins at the saw and that prior cost is attributable to the higher grades of lumber, since it is only because of the higher grades that the log is cut and brought to the saw to begin with. However, we only mention these arguments for the purpose of giving a complete picture of the case, since there are other factors which we believe are determinative of the question regarding inventory. In our opinion in the Appeal of The Buss Co., 2 B. T. A. 266, we said:
However faulty the taxpayer’s inventory method was, we believe that greater weight should be given to consistency than to any particular method of inventorying or basis of valuation so long as the method or basis used substantially reflects the incoma
This language is applicable to this case. The taxpayer consistently took its inventory at market. The respondent has computed a deficiency and in that computation has changed the closing inventory to what is alleged to be cost or market, whichever is lower, but has made no corresponding change in the opening inventory. The Appeal of Sinsheimer Bros., Inc., 5 B. T. A. 918, is directly in point. In that case the petitioner had inventoried beans and grain at market. The Commissioner rejected the closing inventory and redetermined it on the basis of alleged cost, whereas he accepted opening inventory, which was admittedly taken at market. In our opinion, we said:
The inventory practice of the petitioner is undoubtedly faulty, but it can not be said that net income has not been clearly and correctly stated in the return because of the use of those inventories. The opening and closing inventories of the year 1920 have been determined by the petitioner according to a uniform basis of valuation. The error in the basis of valuation is present in both inventories, thus preventing any distortion in the net income for that year. On the other hand, the Commissioner, by accepting petitioner’s opening inventory for the year 1920 and restating the bean and grain inventory, at the close *59 of the same year, at cost, has retained the error in the petitioner’s basis of valuation so far as it affects the opening inventory and eliminated it as it affects the closing inventory. The result necessarily is a distorted net income.
From these cases it appears that income is more nearly reflected by the petitioner’s consistent, though faulty, method of taking inventory than would be reflected by the inconsistent closing inventory contended for by the respondent, even though it be conceded that such closing inventory is technically correct. See also Appeal of Thomas Shoe Co., 1 B. T. A. 124.
The respondent contends that the petitioner’s closing inventory does not reflect fair market value as of the date of inventory. This contention is based solely on the testimony of William L. Martin on cross-examination with reference to sales of lumber taking place from December, 1918, to June, 1919. The sales disclosed by this testimony covered only a very few of the grades of lumber covered by the inventory and although some of the sales tend to show that the fair market value of the lumber was higher than that shown in the inventory, other sales tend to show that the value was less. There is no evidence in the record sufficient to show that the inventory, taken by the sales manager, in accordance with the petitioner’s established practice, on the basis of his experience and knowledge of the business and of'the condition of the market, does not represent fair market value at the time of inventory.
Judgment will be entered on 15 days’ notice, under Rule 50.